### BOOTH FISHERIES CORP. v. EARDLEY et al.

No. 4715.

Court of Civil Appeals of Texas. El Paso.

June 7, 1950.

Rehearing Denied July 5, 1950.

Lang, Byrd, Cross & Ladon, San Antonio, Petry, Jeffery & Dean and Farrow & Johnson, Carrioza Springs, for appellant.

G. C. Mann, Laredo, B. A. Greathouse, Morriss, Morriss & Boatwright and Brewer, Matthews, Nowlin & Macfarland, San Antonio, for appellees.

SUTTON, Justice.

This is an appeal from a judgment of the District Court of Dimmitt County, entered on an instructed verdict for the defendants.

The proceeding was had on the First Amended Petition in Intervention filed by Booth Fisheries Corporation, a Delaware Corporation, in a suit pending in the District Court of Dimmitt County, No. 2663, and styled Elizabeth M. Eardley v. Belle Eardley. The original suit was for a partnership dissolution, accounting and receivership. The intervention by Booth named Roy R. Mogford and his wife. Alberta; Elizabeth M. Eardley, a widow; Belle Eardley, a widow; National Bank of Commerce of San Antonio, and Southern States Insurance Company, a corporation, as defendants in such Intervention. At the conclusion of Booth's testimony the trial court, on the motion of the defendants, instructed a verdict in their favor and entered judgment thereon accordingly from which this appeal is prosecuted.

In its Petition in Intervention Booth alleged that for a number of years Mogford had acted as the duly authorized agent and representative of the Eardleys with full and complete authority to handle, manage, supervise and control all the property of the Eardleys of every kind and to do and transact all business affairs as fully and completely as the Eardleys might have done for themselves individually; that said representation continued until on or about November 5, 1947. It is further charged that during such period of representation Mogford caused numerous business transactions to be had and entered into various business ventures employing the Eardleys' money and property as such agent and representative; that among such enterprises entered into by said Mogford was one known as "Mogford Food Industries" and another known by the name of "Mogford Production Company", and that various other properties under various names were held, owned and operated for various and sundry business purposes.

It is further alleged Booth is engaged in handling various food products such as those produced by the Mogford Food Industries and that it did business with Mogford Food Industries and entered into contracts and advanced money to Mogford Food Industries, including the sum of $15,-000 evidenced by a note dated June 6, 1947, payable on demand at Chicago with 4% interest and signed "Roy R. Mogford, Roy R. Mogford, doing business under the firm name and style of Mogford Food Industries." Booth sets up another indebtedness of the Mogford Food Industries alleged to have originally been evidenced by a note dated October 8, 1947, in the principal sum of $6,573.75, due on or before June 1, 1948, and secured by a mortgage on certain personal property. Booth claimed and sought to recover other debts of account in the sums of $1,162.95, $129.24 and $53.97. Other allegations are made that the debts are due and unpaid, etc.

It is said by Booth that prior to the inception of such debts and its dealings with Mogford and the Mogford concerns Mogford had furnished it with a financial statement showing Mogford had a net estate worth $353,813.05, and listed real and personal property owned by him; that it relied upon such statement and entered into the various business transactions on the faith of such statement. A conveyance from Mogford and wife to the Eardleys wherein all property held by them, except the homestead is conveyed, is pleaded and the purpose of it, as viewed by Booth is alleged. Booth further alleges the Eardleys, prior to the transactions had with Mogford and his concerns, by powers of attorney, deeds or in some other manner clothed Mogford with apparent ownership of the property involved in the receivership and but for which it would not have extended the credit.

Booth then charged Mogford and the Eardleys were partners in the various enterprises and operations of Mogford, with Mogford in active management and control thereof, by reason of which the Eardleys are liable for the debts sued on. In the alternative it is claimed Mogford and the Eardleys engaged in a joint business venture, or that Mogford was the undisclosed agent of the Eardleys and that the Eard-

leys knew or should have known Booth was relying upon the ownership in Mogford of the properties held in his name, or that Mogford was the trustee of the Eardleys and was permitted to use and operate the property and business enterprises for their joint benefit, and permitted Mogford to represent himself as the owner of their properties, and that Booth relied on such representations, by reason of all of which it is claimed the Eardleys and their property is liable for its debts.

Booth says that by reason of all the acts and conduct of the Eardleys pleaded by it they are estopped to deny their relationship with Mogford as principal and agent, or as partners, or as join adventurers, or as trustors and trustee, and the application of their properties to the satisfaction of its debts and that it is entitled to a lien and charge upon each and all of said properties conveyed by Mogford and wife to the Eardleys. No relief is prayed for as against the other defendants in the intervention.

Mogford neither answered nor appeared. The Eardleys answered under oath with various exceptions, a general denial, and special denials in minutest detail of each and every allegation and claim of the Intervenor Booth. They set up in their answer that Mogford was only the employee of A. Eardley Company, a partnership owned and operated by them and as such had authority to look after and receive the rentals and revenues from their various properties and to keep the books and accounts; that just prior to November 5, 1947, they discovered Mogford had diverted and used in his own business and undertakings, without the knowledge and consent of them, funds and assets of the A. Eardley Company in excess of $300,000, a portion of which had gone into the acquisition of the properties conveyed to them by Mogford and wife on November 5, 1947, and that such deed was made in partial restitution of such sum so diverted and used. It is further averred Mogford had burdened a portion of the property conveyed as aforesaid with liens to secure the payment of large sums of money of a grand total in excess of $300,-000 and that they had accepted such convey-ance subject to the liens and debts against it and so secured, but none other.

The Eardleys by further answer say Booth dealt with Mogford in his own individual right and without regard to any relationship claimed by it to exist between them and Mogford; that they resided in the small town of Carrizo Springs where they were well known and that by the exercise of the slightest business prudence it could have ascertained the true facts. They further say that none of the advances made to Mogford or his concerns were made for or used for the acquisition of any of the property and assets conveyed by the deed of November 5, 1947.

Booth says in its first and second points, which they present together, the evidence raised the issue as to whether or not the Eardleys were undisclosed principals operating the business known as Mogford Food Industries by and through Mogford as agent and in his name as a trade name; and that Mogford was operating said concern as trustee for the benefit of the Eardleys so that they as beneficial owners became liable as partners and the trust property became charged with the payment of its obligations.

■ We think the evidence insufficient to support the allegations and claims of Booth or the points made. We have reviewed the entire evidence in this case very carefully because the case was determined on an instructed verdict, which made such review almost imperative. The evidence discloses that A. Eardley Company originated prior to 1906. On the death of its founder the property passed to the three sons of A. Eardley, the last of which sons died in 1939. The Eardley ladies, defendants here, succeeded then to the whole of the property. They were unfamiliar with the business, or any business, and were without experience. Mogford had come to the Company as early as 1934, and on the death of the last of the three sons in 1939 Mogford became the overall manager and director of A. Eardley Company, the partnership business of the Eardleys, and as well very largely of the personal business affairs of

the ladies. He operated under powers of attorney executed by each of the Eardleys, giving and granting to him very broad and comprehensive powers to act for them and in their names, places and stead in the management of their business affairs. He had the authority to do and did do anything the Eardleys might have done in the operation and management of the business and properties belonging to them so long as he acted for and on behalf of them. His activities in his representative capacity were varied and voluminous, as they had to be in the conduct of a business such as he was operating. Mogford was the son-in-law of Elizabeth Eardley and the Eardley ladies were sisters-in-law.

■ The note for $15,000 sued upon is signed in long hand "Roy. R. Mogford", followed with the following typed language: "Roy R. Mogford, doing business under the firm name and style of Mogford Food Industries." The other note, as we understand the record, was signed "Roy R. Mogford". Before the Eardleys may be held liable on these notes it is essential it be shown they signed the same, which does not appear, or that the same was signed by them or by their authority in a trade or assumed name.

Art. 5932, Sec. 18, Vernon's Ann.Civ.St.

The only direct testimony concerning the origin of the obligations sued on is that of Mr. C. A. Linder, Vice-President and Treasurer of Booth. Booth had its first contacts with Mogford in 1946. Booth was interested in purchasing the frozen foods processed by Mogford in the Frozen Food Plant at Carrizo Springs, Texas. As an incident of Booth's business it loaned money to people with whom it had dealings such as Mogford. It had twice loaned Mogford $25,000 which loans were paid. Prior to the dealings Mogford delivered a financial statement purporting to be his individually which he had made to the local bank at Carrizo Springs. On the basis of that statement Booth dealt with Mogford. There is no testimony from the witness that Mogford purported to act for the Eardleys or any one other than himself. Some of the property, if not all of it, included in the

deed of November 5, 1947, was listed as assets in the financial statement submitted by Mogford. So far as the testimony of the witness goes he relied upon the property listed but not upon any relationship that might have obtained between Mogford and the Eardleys. The record is silent as to whether or not Booth even knew of the Eardleys or the A. Eardley Company. All other testimony, including that of the president of the Carrizo Springs Bank which had loaned Mogford a considerable sum of money, is to the effect all the operations carried on in the individual name or the trade names which used the name of Mogford were his individual operations and so considered in the vicinity of Carrizo Springs and that they were no part of the Eardley businesses and operations.

In the third point Booth says as a matter of law, or in any event it appears clearly the evidence raised the issue as to whether the deed of November 5, 1947, was executed by Mogford and accepted by the Eardleys with the intention of subjecting the property thereby conveyed to the payment of the debts created by Mogford both secured and unsecured.

The first recitation in the deed of November 5, 1947, is that in truth and in fact all property, real and personal, held by Mogford and wife is held in trust for the Eardleys, and secondly the Mogfords desire to make the record speak the truth and to place the title in the names of the true owners and then follows the conveyance. The deed contains the following provision, which is relied upon by Booth, to wit: "It is further understood that this conveyance is made with the distinct understanding that the title to each of the several pieces of the real estate and personal property hereby conveyed is conveyed subject to the several liens and debts now existing against the same."

Booth's fourth point is the evidence raised the issue as to whether the Eardleys either knew or by the use of reasonable diligence should have known that their funds and properties had been invested in and were being used in the operation of Mogford Food Industries and that various other prop-

erties which they either owned or in which they had an interest were being held in the name of and operated by Roy R. Mogford, and that third persons were advancing credit to Mogford on the basis of this apparent ownership, possession and operation of said assets, and that said Eardleys by their passiveness were guilty of such culpable negligence as to estop them from asserting title to said assets in denial of the debts of third persons.

It is pointed out in this connection the Eardleys conveyed farm lands to Mogford and he obtained a loan thereon from the Southern States Insurance Company for $100,000 and that a mortgage was given the National Bank of Commerce of San Antonio on certain of the Mogford Food Industries property to secure a sizeable loan, which property was conveyed to the Eardleys by the deed of November 5, 1947. These loans, however, did not purport to be loans to the Eardleys but to be in the name of Mogford or his concerns. The evidence is that when the Eardleys learned their funds and property had been diverted into the properties operated and claimed by Mogford they immediately had the property all conveyed to them.

◼ The relationships between Mogford and the Eardleys, principal and agent, trusteeship, and partnership, which Booth sought to establish and have recognized arise from contract or operation of law. Aside from the powers of attorney which have been referred to and the fact Mogford was an employee of the Eardleys there is no suggestion of a contract relationship and these have no reference to the dealings of Mogford in his own name nor operations of his which he claimed as his own and with which the Eardleys had no connection. About all the evidence in the case suggests is that Mogford might have undertaken those enterprises on behalf of himself and the Eardleys, or on behalf of the Eardleys alone, but there is no proof he did, and in our opinion the evidence is insufficient to sustain a finding to that effect had the case been submitted and such finding been had. No end could be served in undertaking to demonstrate a negative proposition.

We are unable to agree to the construction placed upon the terms of the deed of November 5, 1947, by Booth. Just what the contention is with respect to the recitation in the deed the property therein described and referred to "has been and now is held by us in trust" we are unable to tell. It is a statement of the Mogfords. The evidence discloses Mogford had diverted a large sum of money from the Eardley business and invested it in projects of his own. Property bought with the Eardley funds, notwithstanding the title was taken in Mogford's name, belonged to the Eardleys and he was but a trustee. This is elementary, and if the recitation has any significance it could hardly mean anything more than that.

◼ As we understand Booth it relies primarily upon the statement in the deed that the several pieces of property conveyed "is conveyed subject to the several liens and debts now existing against the same," and that included in the debts are the unsecured debts. Mogford had created liens against separate pieces of property to secure separate debts owing different creditors. A recitation in a deed the conveyance is made subject to a debt or debts ordinarily means the grantee does not become personally liable for the debts, Slaughter v. Morris, Tex.Civ.App., 291 S.W. 961; Fidelity Union Fire Ins. Co. v. Cain, Tex.Civ.App., 28 S.W.2d 833; George v. Blumberg, Tex.Civ.App., 211 S.W. 309; Campbell v. Jones, Tex.Civ.App., 230 S.W. 710; Brooks v. Erbar, Tex.Civ.App., 186 S.W.2d 372; Homeland Realty Co. v. Wheelock, Tex.Civ.App., 119 S.W.2d 167.

◼◼ Debts against property it is thought means those debts fixed and established against it by contract or process of law, and does not include unsecured debts. It is true, of course, one's property is subject to his debts and the debts may be made out of the property so long as it remains in him, but a conveyance passes the title free of the unsecured debts, otherwise there could be no safe dealings in property.

Booth in support of its asserted estoppel against the Eardleys on the theory they knew or ought to have known by the use

of ordinary diligence their property and funds were invested and being used by Mogford and that various properties which they owned or had an interest in were being held in the name of Mogford and that third parties had dealt with Mogford on the faith of such ownership to their injury relies upon the cases of Weinstein v. National Bank, 69 Tex. 38, 6 S.W. 171; Lloyds Casualty Insurer v. Farrar, Tex.Civ.App., 167 S.W. 2d 221; Crockett v. Rogers, Tex.Civ.App., 137 S.W.2d 185 and Reynolds Co. v. Reynolds, 190 Ala. 468, 67 So. 293. The soundness of those decisions and the principles of law there announced cannot be questioned but the facts are essentially different from the facts in the instant case. In the first case the forged checks were in the possession, of the plaintiff, the party estopped, and he could have known the facts by merely looking at them, which he did at a late date and after the Bank had been prejudiced by his inaction, hence the holding the plaintiff ought to have known and the knowledge imputed to him. In the second case the Company issued the bond to be used for the very purpose it was used for and knew it had been rejected but did not recall it. The knowledge was in hand. In the third case the plaintiff had intentionally and expressly clothed his co-owner and agent with full authority to do just what he did do, and the preferred creditors procured the notes sought to be recovered as pledges to secure their debts. In each of the cases the party estopped was in possession of the facts which estopped him.

Particular emphasis is laid on the Alabama case and it is asserted to be directly in point. We do not think so. The Reynolds Company operated its business in two different towns. The larger operation was had in Centerville, where H. E. Reynolds was in full and complete charge. The court points out that the stockholders of the Company knew that H. E. Reynolds was not the owner of the property he had purchased with Company funds and taken title to in his own name, but the outside world did not, but regarded H. E. Reynolds as the owner. The agent of the Company was knowingly permitted by the Company to invest its funds in visible property in his own name and assume toward it the attitude of absolute owner insofar as the community and outside world was informed. With this knowledge, as is specifically pointed out by the court, the representations of the agent was nothing less than the representations of the Company. Of course, the Company was bound. The community of Centerville was a small community and the facts were known by the entire community and the Bank loaned its money on the faith of the representations made and the best information obtainable, knowingly permitted. The Bank filed its plea of intervention in a purely equitable proceeding the purpose of which was to have the property decreed to be assets of a trust and to vest the legal title in the equitable owner. The Bank sought to prevent the divestiture of the title out of the estate of H. E. Reynolds, then deceased. It was not a suit to subject property already conveyed in satisfaction of a debt of a preferred creditor, nor to charge the Company with liability. The court points this out and the fact the common law rule which permits a debtor to prefer a creditor and convey his property in satisfaction of a debt has been changed by statute in Alabama. Booth knew none of the facts concerning the relationships between Mogford and the Eardleys but relied upon its previous dealings with Mogford and a copy of a financial statement made by Mogford to the Carrizo Bank which did not reflect the facts. In other words, it did not rely upon any fact representation made by the Eardleys or any fact known to them and represented to be a fact by Mogford.

It is not enough that the person sought to be estopped might have known the facts by the exercise of ordinary care, but we understand the rule to be that he must know the fact or, as said in Weinstein v. National Bank, supra, be in such a position that he ought to have known them, so that knowledge will be imputed to him. It is held in Richey v. Miller, 142 Tex. 274, 177 S.W.2d 255, at page 257(3–5) that an estoppel will not operate against a person who stands by and allows another to deal with his property when the person sought to be estopped has no knowledge of his interest in the property. The evidence in this

case fails to show any knowledge on the part of the Eardleys that Mogford had invested their funds in the property he was claiming as his own until just prior to November 5, 1947.

The learned trial court aptly remarked that Mogford did not lose his individual identity when he became the agent of the Eardleys. It would be a rare thing if an agent would not engage in some activities of his own. If the rule contended for by Booth were adopted every agent who misuses his principal's funds and property woud involve the principal in much vexing litigation in defense of alleged negligence, of failure to learn of such misuse.

Booth would have been in no stronger position had Mogford actually owned the property conveyed to the Eardleys. It is not disputed he owed them far in excess of the value of the property and in such circumstances he had the right to convey the property in satisfaction, or partial satisfaction of the debt. Adams v. Williams, 112 Tex. 469, 248 S.W. 673, at page 676(3). It is our conclusion there is no error in the judgment and determination of the trial court and the judgment is affirmed.